Emilio A. Cazares, Esq., SBN 324810
Cassie N. Holloway, Esq., SBN 328284
C. Tab Turner (motion for admission pro hac vice forthcoming)
**TURNER & ASSOCIATES, P.A.**
1001 B Ave., Suite 308
Coronado, California 92118
Telephone: (619) 537-0007
emilio@tturner.com
cassie@tturner.com
tab@tturner.com

Attorneys for All Plaintiffs

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

SAFWAN SHOUFAN, HILIN SHIKHANI, ETAB HRIEB, RAIEFA MOSLIM, SAMEER E. SHAMON, MARYAM SHAHADEH, AFRAM MERJAN, MOHAMAD ALOQDEH, GHAZALAH ALHAMOUD, ANEES RAHMOUN, MADLEN TAMMO, YOUKHNA AMO, SHAMERAN BARNABAS, CHAMOUN LAZAR, LAZAR ODICHO, CHERINA YOUNAN, JAMILA ISAAK and SHARLET YOUNAN,

Plaintiffs,

vs.

MOUTAZ AL-KHAYYAT, RAMEZ AL-KHAYYAT, and URBACON TRADING AND CONTRACTING (UCC),

Defendants.

Case No. '26CV5548 WQHDDL

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, by their attorneys, allege the following:

## I. NATURE OF THE ACTION

1. Plaintiffs bring this Complaint pursuant to 18 U.S.C. § 2333(a) and (d) of the Anti-Terrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), against (1) Moutaz Al-Khayyat and (2) Ramez Al-Khayyat (together, the "Al-Khayyat brothers"), citizens of Syria and Qatar, and (3) Urbacon Trading and Contracting ("UCC"), a corporation headquartered and incorporated in Qatar (collectively, "Defendants").

2. Plaintiffs allege that Defendants aided and abetted, and conspired with, al-Qaeda in Iraq ("AQI"), Al Nusra Front ("ANF"), and the Islamic State of Iraq and Syria ("ISIS") between the years 2011 and at least 2015 (the "Relevant Period"); that at the time of each of the attacks at issue (the "Attacks"), the organization that committed it was designated as (or was part of) a Foreign Terrorist Organization ("FTO"); and that those FTOs kidnapped, murdered, and/or injured Plaintiffs or their close family members in Syria between 2013 and 2015.

3. Defendants did so by knowingly providing AQI, ANF,[1] and ISIS with substantial assistance throughout the Relevant Period by supplying them with a variety of weapons and at least tens of millions of dollars in U.S. bank notes, including payments specifically made to support the FTOs' violent terrorist activities.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333(a) and 2338, as a civil action brought by nationals of the United States, who were injured by reason of acts of international terrorism.

---

[1] Al Nusra Front, also known as Jabhat al-Nusra, has undergone several name changes. In 2016 it rebranded as Jabhat Fatah al-Sham, and in 2017 it merged with other factions to form Hay'at Tahrir al-Sham ("HTS"). The State Department amended ANF's FTO designation to add those names as aliases in 2016 and 2018, respectively.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(c)(3) because no Defendant is a resident of the United States.

6. Defendants are subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a) and Fed. R. Civ. P. 4(k)(2).

7. During the Relevant Period, as part of their efforts to assist AQI, ANF, and ISIS, Moutaz and Ramez Al-Khayyat exploited their access to the U.S. financial system to transfer funds from Qatar, converting Qatari Riyals into U.S. dollars through their banks in Doha (as well as the accounts of UCC) using U.S. correspondent accounts to wire funds and obtain large quantities of U.S. bank notes that they directed to be distributed to ANF and ISIS in Syria and northwestern Iraq.[2]

8. Defendants knew that AQI had for years specifically targeted American service members in Iraq, killing and maiming hundreds of them.

9. Defendants also knew that AQI (and later its successor organizations, ANF and ISIS) specifically targeted American citizens for kidnapping and ransom and supported their efforts.

10. Defendants knew about, and actively supported, ANF's and ISIS's kidnapping and ransom enterprise (including, but not limited to, the abduction of Americans).

11. Early in 2014, Moutaz Al-Khayyat led a delegation of Syrian businessmen to Washington, D.C. to meet government officials and discuss the Syrian crisis. At a gathering held by the Association of Syrian Christians for Peace in Washington, D.C., Moutaz Al-Khayyat discussed the role U.S. businesses could play in rebuilding Syria and announced that his group had donated funds to establish a center to combat extremism and radicalism in the Middle East that would itself be based in the United States.

---

[2] Some of this illicit activity was undertaken through UCC's bank accounts, as discussed below. UCC had at least two bank accounts at Doha Bank in Qatar with account numbers ending in 1-10-0.

12. Moutaz Al-Khayyat stated that "Syrian businessmen" had "to take every effort . . . to meet influential international players in the United States in order to help put an end to the humanitarian sufferings of the Syrian people," and announced that his group had offered 20 scholarships for Syrian students at American universities. The delegation held direct meetings with U.S. lawmakers and government officials, met with members of the American Chamber of Commerce, and with senior American businessmen in both Washington, D.C. and New York.

13. During this period, Moutaz Al-Khayyat was publicly quoted as saying that UCC is "based in Qatar but with operations ongoing within the GCC, USA, Europe and Asia."

14. One example of UCC's U.S. operations is its contract with U.S. company Saladworks, described as "the nation's first and largest fresh-tossed salad franchise concept." Saladworks, headquartered in the United States, signed a Master Franchise Agreement with UCC to bring five Saladworks locations to Qatar, with openings planned for September 2014.

15. In 2015, UCC's flagship development project, Mall of Qatar, became a vehicle for further American commercial ties. Mall of Qatar signed a leasing agreement to bring American stores to the mall, including American Eagle Outfitters, Starbucks, The Cheesecake Factory, Texas Roadhouse, Payless Shoe Source, Victoria's Secret, PF Chang's, Shake Shack, Pottery Barn, Bath & Body Works, Foot Locker, and others.

16. During the same period, Defendants retained Du Plain Global Enterprises, Inc., a public relations firm based in Washington, D.C., to handle public relations efforts in the U.S. and issue press releases on the PR Newswire, directed at a U.S. audience. This PR firm published releases listing the American stores set to be opened at UCC's Mall of Qatar.

17. In another press release published on the PR Newswire in 2015, Moutaz Al-Khayyat was reported to have personally funded the Institute of International

Education, a nonprofit organization established in New York, which in turn provided scholarships to 43 Syrian students at 34 U.S. colleges and universities.

18. In 2022, the Al-Khayyat brothers formed Power International USA, LLC, a domestic Delaware limited liability company that they control, with Mazen Al-Sbeti, an executive of the brothers' Qatari conglomerate, Power International Holding ("PIH"), installed as its CEO. Power International USA was described by the *Qatar Tribune* on May 29, 2025, as an "American company specializing in strategic energy investments."

19. Power International USA and UCC are both part of PIH, the Doha-based conglomerate[3] founded by Moutaz and Ramez Al-Khayyat.

20. Both Moutaz and Ramez Al-Khayyat attended the January 2025 inauguration of President Trump and its dinners. Ramez Al-Khayyat called it "an amazing experience. Once in a lifetime."

21. Just months after the inauguration, in May 2025, the Syrian government, now led by Ahmed al-Sharaa — who, under his nom de guerre Abu Muhammad al-Julani, founded and led ANF — signed a $7 billion deal to develop four gas-powered plants and a 1,000-megawatt solar farm in Syria, aiming to generate roughly 5,000 megawatts of electricity. The consortium was led by UCC's concession arm (UCC Concessions Investment) together with Turkey's Kalyon and Cengiz energy units and the Al-Khayyats' own Delaware entity, Power International USA.

22. In August 2025, the same Syrian government signed on to a $4 billion Damascus Airport redevelopment consortium led by UCC Holding that includes New York City-based Assets Investments USA LLC. Assets Investments USA's CEO on

---

[3] *See* https://www.linkedin.com/pulse/syria-signs-deal-5gw-power-projects-meed-qwfuf/; https://x.com/yarbatman/status/1927739837647339634: "Power International USA is a subsidiary of Power International Holding, a Qatari company. This might be a case of the consortium deliberately creating a US nexus to get cover from GL 25 and more direct guidance from US authorities. Clever way to address compliance risks."

the deal, Anthony Salter, signed the memorandum of understanding ("MOU") at a ceremony attended by then-U.S. Ambassador to Turkey and U.S. Special Envoy for Syria Tom Barrack, alongside Moutaz and Ramez Al-Khayyat. At the later signing of the final concession agreement, Assets Investments USA was represented by Mazen Al-Sbeti, the same individual who serves as CEO of the Al-Khayyat brothers' Power International USA.

23. In December 2025, al-Sharaa held a meeting bringing together the Syrian Petroleum Company ("SPC") and the American oil company Chevron to discuss opportunities for cooperation in oil and gas exploration along the Syrian coast. Attendees included U.S. Special Envoy Tom Barrack, Syrian Foreign Minister Asaad Hassan al-Shaibani, SPC CEO Youssef Qablawi, a Chevron delegation, and Moutaz and Ramez Al-Khayyat, described in the meeting's own press coverage as, respectively, Chairman and CEO of "the global UCC company."

24. That meeting led to SPC signing a preliminary MOU with Chevron International and UCC on February 4, 2026, at a ceremony at the Presidential Palace in Damascus attended by the U.S. Special Envoy to Syria, aimed at evaluating oil and gas exploration opportunities in Syrian territorial waters in the eastern Mediterranean.

25. By May 2026, SPC, Chevron, and UCC had jointly identified an offshore block to advance that exploration, and by June 2026 were discussing converting the MOU into a binding executive contract.

26. During those same June 2026 discussions, SPC and Chevron also explored Chevron potentially joining a separate cross-border crude oil pipeline project linking Iraq and Syria.

27. That pipeline initiative was itself formalized in July 2026 through a government-to-government MOU between Iraq and Syria and separate Heads of Agreement signed by UCC's concessions arm, Chevron Business Development EMEA Ltd., and TI Capital, signed in Washington, D.C., in the presence of the Iraqi Prime Minister.

28. During this same period, the Al-Khayyat brothers' agribusiness venture, Baladna Q.P.S.C., undertook a $3.5 billion integrated dairy project in Algeria built in partnership with UCC, relying on American commercial suppliers: Valmont Industries, a U.S. public company, to supply irrigation systems, and U.S. livestock exporters, including Pennsylvania-based Scarff Bros., Inc., to supply 30,000 Holstein Friesian dairy cattle airlifted from nine U.S. states in a 109-flight program estimated to generate $250–300 million in U.S. economic activity.

29. The April 2026 signing ceremony for that program's second phase was attended by Mark Schapiro, identified as the U.S. Chargé d'Affaires.

30. Moutaz Al-Khayyat publicly credited the project's success to "leading companies from the United States, Germany, Qatar, and Algeria."

31. In June 2026, the U.S. International Development Finance Corporation ("DFC"), a U.S. government agency headquartered in Washington, D.C., announced its interest in partnering with PIH to upgrade and transition telecom infrastructure in Kazakhstan. PIH owns Tele2, one of Kazakhstan's largest telecom companies. The signing of the letter of interest and financing proposal took place in Astana, Kazakhstan, where DFC CEO Ben Black and PIH President and Group CEO Ramez Al-Khayyat signed the letter in the presence of Moutaz Al-Khayyat, PIH's Group Chairman, along with PIH's Group CEO for Telecom, Media and Technology, and two senior DFC officials (DFC's Chief of Staff and Head of Investments, and DFC's Deputy Chief of Staff). DFC's own press release states that "[t]his announcement would not have been possible without President Trump's steadfast commitment to strengthening America's strategic interests across Central Asia," and quotes CEO Black describing the deal as "a game-changer for regional connectivity."

## III. PARTIES

### A. The Plaintiffs

#### 1. Safwan Shoufan

32. Plaintiff Safwan Shoufan is a citizen of the United States and domiciled

in the State of California.

33. On or about January 5, 2014, Plaintiff Safwan Shoufan was kidnapped in Syria by ISIS and held captive for 19 days, during which his ISIS captors beat him repeatedly.

34. As a result, Plaintiff Safwan Shoufan suffered physical injuries and pain, severe mental anguish, extreme emotional distress, and lasting psychological trauma, including the terror of being held by an organization that routinely tortured and executed its captives.

**2. Hilin Shikhani**

35. Plaintiff Hilin Shikhani is a citizen of the United States and domiciled in the State of California.

36. On or about June 19, 2013, in the Qaboun area of Damascus, Syria, Plaintiff Hilin Shikhani's brother was abducted by ISIS after being shot in the leg at an ISIS checkpoint. Plaintiff Hilin Shikhani's brother is still missing and is presumed dead. His remains have never been recovered, and his family has never learned what became of him.

37. As a result, Plaintiff Hilin Shikhani has experienced, and continues to experience, severe mental anguish, extreme emotional pain and suffering, and the loss of her brother's society, companionship, comfort, and counsel — compounded by the ongoing anguish of never learning his fate or being able to bury him.

**3. Etab Hrieb**

38. Plaintiff Etab Hrieb is a citizen of the United States and domiciled in the State of Illinois.

39. On or about August 8, 2014, in Deir ez-Zor, Syria, Plaintiff Etab Hrieb's son was kidnapped by ISIS. He was held captive and ultimately murdered by ISIS three months later, on November 2, 2014.

40. As a result, Plaintiff Etab Hrieb has experienced, and continues to experience, severe mental anguish, extreme emotional pain and suffering, and the loss

of her son's society, companionship, comfort, and counsel — compounded by the months of terror during which she knew her son was in ISIS's hands.

**4. Raiefa Moslim**

41. Plaintiff Raiefa Moslim is a citizen of the United States and domiciled in the State of Nebraska.

42. On or about May 19, 2013, in Raqqa, Syria, Plaintiff Raiefa Moslim's husband was kidnapped by ISIS. Plaintiff Raiefa Moslim's husband remains missing and is presumed dead. Plaintiff Raiefa Moslim's house and her husband's office were seized and marked with signs declaring them "Under the control of the Islamic State" following the abduction.

43. Plaintiff Raiefa Moslim has never learned what became of her husband, and his remains have never been recovered.

44. As a result, Plaintiff Raiefa Moslim has experienced, and continues to experience, severe mental anguish, extreme emotional pain and suffering, the loss of her husband's society, companionship, comfort, support, and counsel, and the loss of her home and property — compounded by the ongoing anguish of never learning her husband's fate.

**5. Sameer E. Shamon**

45. Plaintiff Sameer E. Shamon is a citizen of the United States and domiciled in the State of Michigan.

46. On or about August 6, 2013, in Jaramana, Syria, Plaintiff Sameer E. Shamon's wife was murdered, along with 17 other people, by a car bomb placed by ANF.

47. As a result, Plaintiff Sameer E. Shamon has experienced, and continues to experience, severe mental anguish, extreme emotional pain and suffering, and the loss of his wife's society, companionship, comfort, support, and counsel.

**6. Maryam Shahadeh**

48. Plaintiff Maryam Shahadeh is a citizen of the United States and

domiciled in the State of Michigan.

49. On or about March 1, 2013, in Daraa, Syria, ANF terrorists attacked Plaintiff Maryam Shahadeh's family. During the attack, ANF terrorists beat Plaintiff Maryam Shahadeh, and shrapnel from ANF shelling struck her husband and her daughter. Her husband's injuries required the amputation of his finger, and her daughter was blinded in one eye.

50. As a result, Plaintiff Maryam Shahadeh has suffered physical injuries and pain, severe mental anguish, and extreme emotional pain and suffering, including from the maiming of her husband and the blinding of her daughter.

**7. Afram Merjan**

51. Plaintiff Afram Merjan is a citizen of the United States and domiciled in the State of Illinois.

52. On or about July 18, 2014, in Al-Hasakah, Syria, Plaintiff Afram Merjan's brother, Hanna Daniel Merjan, was kidnapped by ISIS and tortured for three days because he was Christian and refused to convert to Islam.

53. His family paid a $15,000 ransom to ISIS to secure his release.

54. As a result of ISIS's terrorist attacks and genocide, Plaintiff Afram Merjan has experienced, and continues to experience, severe mental anguish, extreme emotional pain and suffering, and economic loss.

**8. Mohamad Aloqdeh**

55. Plaintiff Mohamad Aloqdeh is a citizen of the United States and domiciled in the State of Michigan.

56. On or about September 1, 2013, in Harbel, Syria, Plaintiff Mohamad Aloqdeh was beaten and abducted from his home by ISIS after being accused of drinking alcohol.

57. He was detained with over 60 other men and tortured repeatedly by ISIS for 24 hours.

58. After his release, Plaintiff Mohamad Aloqdeh learned that his name was

on an ISIS list for recapture and death, so he was forced to abandon his home and flee to Turkey and, eventually, the United States.

59. Plaintiff Mohamad Aloqdeh's nephew and cousin were also killed by ISIS in September 2013.

60. As a result, Plaintiff Mohamad Aloqdeh has suffered physical injuries and pain, severe mental anguish, extreme emotional distress, and lasting psychological trauma, as well as the loss of his home, and the grief of losing his nephew and cousin to ISIS.

**9. Ghazalah Alhamoud**

61. Plaintiff Ghazalah Alhamoud is a citizen of the United States and domiciled in the State of Georgia.

62. On or about May 16, 2013, in Aleppo, Syria, Plaintiff Ghazalah Alhamoud's brother was kidnapped and murdered by ANF.

63. As a result, Plaintiff Ghazalah Alhamoud has experienced, and continues to experience, severe mental anguish, extreme emotional pain and suffering, and the loss of her brother's society, companionship, comfort, and counsel.

**10. Anees Rahmoun**

64. Plaintiff Anees Rahmoun is a citizen of the United States and domiciled in the State of Michigan.

65. On or about April 1, 2013, in Al Ghariya, Syria, Plaintiff Anees Rahmoun was struck by shrapnel from an ANF explosion and lost part of his left index finger. Plaintiff Anees Rahmoun's daughter was blinded in her left eye by the shrapnel.

66. As a result, Plaintiff Anees Rahmoun has suffered physical injuries, permanent disfigurement, and pain, severe mental anguish, and extreme emotional pain and suffering, including from the permanent blinding of his daughter.

**11. Madlen Tammo**

67. Plaintiff Madlen Tammo is a national of the United States and domiciled in the State of California. She is the daughter of Iniar Abdal.

68. On or about February 23, 2015, in the Khabur River region near Tel Shamiram, in Al-Hasakah Governorate, Syria, Plaintiff Madlen Tammo's mother, Iniar Abdal, was kidnapped by ISIS in a mass abduction of Assyrian Christians and was held captive until November 7, 2015. As a result of her captivity, Iniar Abdal suffered from severe depression, loss of appetite, and heart problems, and she ultimately died of her injuries on June 25, 2018.

69. As a result, Plaintiff Madlen Tammo, individually, has experienced, and continues to experience, severe mental anguish and extreme emotional pain and suffering, including throughout the more than eight months during which her mother was held captive and abused by ISIS, not knowing whether her mother would survive. Following her mother's death, Plaintiff Madlen Tammo has also suffered the loss of her mother's society, companionship, comfort, and counsel.

**12. Youkhna Amo**

70. Plaintiff Youkhna Amo is a national of the United States and domiciled in the State of California.

71. On or about February 23, 2015, in the Khabur River region near Tel Shamiram, in Al-Hasakah Governorate, Syria, Plaintiff Youkhna Amo was kidnapped by ISIS and held captive until December 9, 2015. During his more than nine months of captivity, his ISIS captors tortured him.

72. As a result, Plaintiff Youkhna Amo has suffered physical injuries and pain, severe mental anguish, extreme emotional distress, and lasting psychological trauma. He suffers from attack-related chronic anemia and osteoarthritis that require ongoing treatment and monitoring; a nicotine dependence that developed as a means of coping with his captivity; and severe symptoms of post-traumatic stress disorder ("PTSD") from prolonged captivity and torture, including persistent nightmares, insomnia, hypervigilance, irritability, intrusive memories, emotional distress, and anxiety.

**13. Shameran Barnabas**

73. Plaintiff Shameran Barnabas is a national of the United States and domiciled in the State of California.

74. She is the sister of Abdulmasih Enwiya who was kidnapped on February 23, 2015, and held by ISIS terrorists until September 23, 2015, when he and two other Assyrians abducted by ISIS were executed on video by ISIS terrorists who shot each of them in the back of the head while they were kneeling and wearing orange jumpsuits.

75. As a result, Plaintiff Shameran Barnabas has suffered severe mental anguish, grief, extreme emotional distress, and lasting psychological trauma.

**14. Chamoun Lazar**

76. Plaintiff Chamoun Lazar is a national of the United States and domiciled in the State of Illinois.

77. On or about February 23, 2015, in the Khabur River region near Tel Shamiram, in Al-Hasakah Governorate, Syria, Plaintiff Chamoun Lazar was kidnapped by ISIS and held captive until December 9, 2015. His ISIS captors tortured him for months.

78. As a result, Plaintiff Chamoun Lazar has suffered physical injuries and pain, severe mental anguish, extreme emotional distress, and lasting psychological trauma, including chest pains caused by the stress of months of torture, trouble sleeping, flashbacks, and depression.

**15. Lazar Odicho**

79. Plaintiff Lazar Odicho is a national of the United States and domiciled in the State of Illinois.

80. On or about February 23, 2015, in the Khabur River region near Tel Shamiram, in Al-Hasakah Governorate, Syria, Plaintiff Lazar Odicho and his wife, Plaintiff Cherina Younan, were kidnapped by ISIS and held captive until August 11, 2015. During their captivity, each suffered from malnutrition and dehydration and was

subjected to constant emotional abuse by their ISIS captors.

81. As a result, Plaintiff Lazar Odicho has suffered physical injuries and pain, severe mental anguish, extreme emotional distress, and lasting anxiety and depression, as well as severe mental anguish and emotional pain and suffering arising from the captivity and abuse of his wife.

**16. Cherina Younan**

82. Plaintiff Cherina Younan is a national of the United States and domiciled in the State of Illinois.

83. On or about February 23, 2015, in the Khabur River region near Tel Shamiram, in Al-Hasakah Governorate, Syria, Plaintiff Cherina Younan and her husband, Plaintiff Lazar Odicho, were kidnapped by ISIS and held captive until August 11, 2015, as described above.

84. As a result, Plaintiff Cherina Younan has suffered physical injuries and pain, severe mental anguish, extreme emotional distress, and lasting anxiety and depression, as well as severe mental anguish and emotional pain and suffering arising from the captivity and abuse of her husband.

**17. Jamila Isaak**

85. Plaintiff Jamila Isaak is a national of the United States and domiciled in the State of Illinois. She is the widow of George Younan.

86. On or about February 23, 2015, when ISIS terrorists came to George Younan's village in the Khabur River region near Tel Shamiram, in Al-Hasakah Governorate, Syria, he attempted to flee but was immediately captured and shot. George Younan died that day of the injuries ISIS inflicted. His body was not recovered until three months later, after the village was liberated.

87. As a result, Plaintiff Jamila Isaak has experienced, and continues to experience, severe mental anguish, extreme emotional pain and suffering, and the loss of her husband's society, companionship, comfort, support, and counsel — compounded by the months during which his body lay unrecovered.

88. George Younan was injured in his person by reason of ISIS's attack. As his survivor and heir, Plaintiff Jamila Isaak is entitled to recover the damages George Younan sustained.

**18. Sharlet Younan**

89. Plaintiff Sharlet Younan is a national of the United States and domiciled in the State of Illinois.

90. She is the daughter of George Younan, whom ISIS captured and killed on or about February 23, 2015, as described above.

91. As a result, Plaintiff Sharlet Younan has experienced, and continues to experience, severe mental anguish, extreme emotional pain and suffering, and the loss of her father's society, companionship, comfort, support, and counsel.

92. As George Younan's survivor and heir, Plaintiff Sharlet Younan is entitled to recover the damages George Younan sustained.

**B. The Defendants**

**1. Moutaz and Ramez Al-Khayyat**

93. The Al-Khayyat brothers belong to a prominent Syrian family long involved in construction.

94. Their maternal uncle is Muhammad Hamsho, a former loyalist of the former Assad regime who was designated by the U.S. Department of the Treasury on August 4, 2011, pursuant to Executive Orders 13,572 and 13,573, for acting for or on behalf of Bashar al-Assad and his brother Maher al-Assad, for whom, according to Treasury, Hamsho served as a frontman.[4]

95. Their mother, Samya [a/k/a Samiyah or Sumaya] née Hamsho, is close to Sheikha Moza bint Nasser, the consort of Sheikh Hamad bin Khalifa Al Thani, former Emir of the State of Qatar.

96. Moutaz and Ramez Al-Khayyat relocated to Qatar sometime after 2010

---

[4] Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions Prominent Syrian Businessman* (Aug. 4, 2011), https://home.treasury.gov/news/press-releases/tg1269.

and later obtained Qatari citizenship.

97. After the Syrian civil war erupted in 2011, Moutaz and Ramez Al-Khayyat leveraged their family's long-standing connection to the Assad regime to settle in Qatar and cultivate the patronage of the Qatari regime which shifted its support to jihadist organizations fighting to overthrow the Assad regime.

98. Because of their family connections in Syria, they were able to travel back and forth and move around Syria despite the ongoing civil war and deteriorating relationship between the Assad regime and the Qatari regime.

99. This "natural cover" made Moutaz and Ramez Al-Khayyat ideal conduits for efforts to support AQI, ANF, and ISIS in Syria.

100. As the Assad regime began to better understand the Al-Khayyat brothers' involvement in supporting the extremist opposition groups (including ANF and ISIS), it increased its measures against them, canceling contracts and seizing their funds. The cancellations "came as a result of the contractor's support and funding of the terrorist groups and plotting against the state …."

101. In 2014, a Syrian court convicted Ramez Al-Khayyat of providing money and weapons to terrorist groups, citing, *inter alia*, phone calls he placed that were intercepted by Syria's Air Force Intelligence Directorate. He was sentenced to death in absentia.

102. Although these financial losses were significant, they were eclipsed by the enormous wealth to be gained by serving the Qatari regime.

### 2. Urbacon Trading and Contracting (UCC)

103. The Al-Khayyat brothers control and operate various companies in Qatar including:

- **UCC**[5] is a Qatar-based international construction services company involved in several high-profile projects such as

[5] Khayyat Contracting and Development ("KCD") and Khayyat Contracting and Trading ("KCT") (formed in Syria in the 1980s) appear to have been folded into UCC at the beginning of 2011.

the Mall of Qatar, Banana Island Resort, and several projects connected to the 2022 FIFA World Cup. Moutaz Al-Khayyat served as the company's chairman and Ramez Al-Khayyat served as vice-chairman and CEO.

- **International Design & Consultant Corporation ("IDCC")** is a design company which originated under the name Highness Design, which was the design brand of their mother. The CEO of Highness Design, and then of IDCC, was Moutaz Al-Khayyat. IDCC is registered in St. Kitts and Nevis and has a bank account with Doha Bank, with an account number ending in 1-10-0, SWIFT code DOHBQAQA.

- **Palmera Landscape**, a landscaping company.

104. As described below, overcharges orchestrated by the Al-Khayyat brothers for UCC construction contracts were diverted to fund ANF and ISIS.

## IV. FACTUAL ALLEGATIONS

105. Defendants aided several terrorist groups. The three most relevant to this Complaint are AQI, ISIS and ANF, which were at all relevant times U.S.-designated FTOs that attacked Americans – including Plaintiffs and their family members – in Syria and elsewhere. To contextualize Defendants' conduct, this section provides an overview of both FTOs and their place within the wider constellation of Muslim Brotherhood-affiliated organizations.

### A. THE MUSLIM BROTHERHOOD AND AL QAEDA

106. Hassan al-Banna founded the Muslim Brotherhood in 1928 in Egypt. The movement fused religious revival, political activism, and ideological elements borrowed from Italian fascism, growing into a mass movement in Egypt while serving as a model for Islamic groups across the region that did not adopt the more popular secular Arab nationalism of the day.

107. In a passage well known to generations of Muslim Brothers, Banna explained: "Islam is a faith and a ritual, a nation and a nationality, a religion and a state, spirit and deed, holy text and sword."

108. In 1954, Muslim Brotherhood members attempted to kill Egypt's leader, Gamal Abdel Nasser, triggering a nationwide crackdown that included the imprisonment of thousands of Muslim Brotherhood members. The crackdown eventually led to the exile of many of the movement's senior leaders, including its eventual spiritual leader, Dr. Yussuf al-Qaradawi.

109. But the Muslim Brotherhood movement proved highly adaptive.

110. Muslim Brotherhood members sought and obtained refuge in Qatar beginning in the mid-20th century, first after President Nasser's crackdowns in Egypt and later after the Gulf states expelled Brotherhood-linked figures following Iraq's 1990 invasion of Kuwait.

111. In commemorating the 70th anniversary of the Muslim Brotherhood, al-Qaradawi wrote that the Brotherhood is "not only the largest Islamist movement. It is also the mother of all Islamist movements."

112. The Muslim Brotherhood has had a profound influence on the belief system that fuels al-Qaeda, ISIS, and ANF. Despite their periodic disagreements, these groups share ideological underpinnings based on the writings of the late Brotherhood ideologue Sayyid Qutb and other Brotherhood writers, which shaped these entities into what they remain today.

113. In 1973, a Muslim Brotherhood offshoot was formed, called Egyptian Islamic Jihad. It was later responsible for the assassination of Egyptian President Anwar Sadat in 1981.

114. Ayman al-Zawahiri became the group's leader in 1993.

115. al-Gama'at al-Islamiyya (The Islamic Society) also emerged from Muslim Brotherhood circles in Egypt and remained active through the 1990s. It was involved in the first World Trade Center bombing in 1993 and was responsible for the Luxor massacre that claimed 62 lives in 1997, when six Islamist militants disguised as security forces carried out a brutal terrorist assault at Deir el-Bahari, an ancient archaeological site in Luxor, Egypt.

116. The Jordanian branch of the Muslim Brotherhood was founded in 1945 and participated in Jordanian parliamentary elections in the late 1980s and early 1990s, including under the banner of the Islamic Action Front. Like its international counterparts, it has splintered into multiple organizations but maintains its core ideology.

117. The Syrian branch of the Muslim Brotherhood was also founded in 1945.

118. At its founding, the Syrian Muslim Brotherhood enjoyed a wide base of support drawn from politically active Islamic institutions that had formed in the 1920s and 1930s. It actively participated in Syrian politics in its first two decades of existence before the rise of Nasser in Egypt, the later Ba'athist takeover in 1963, and Hafez al-Assad's seizure of power in 1970.

119. In June 1980, Muslim Brotherhood members attempted to assassinate President Hafez al-Assad using grenades and machine guns. Assad's government launched a crackdown on the group and gunned down hundreds of Brotherhood members in their prison cells.

120. In July 1980, the Syrian government enacted Law No. 49, making membership in the Muslim Brotherhood a capital offense. During the months of August, September, and November 1981, the Brotherhood carried out three car-bomb attacks against military and government forces and infrastructure in Damascus, resulting in the deaths of hundreds of people.

121. In February 1982, the Assad regime launched a brutal crackdown on the Brotherhood, killing an estimated 10,000-40,000 people in what became known as the "Hama massacre." The siege nearly destroyed the Muslim Brotherhood's Syrian branch and forced its surviving leadership and members into exile.

122. In the early 2000s, the Syrian Muslim Brotherhood issued several documents, including joint statements with secular opposition figures, renouncing violence and calling for minority rights and free elections.

123. Despite these political declarations, the Brotherhood remained banned

and largely inactive inside Syria until the outbreak of the 2011 Arab Spring, a series of anti-government protests, uprisings, and armed rebellions that spread across much of the Arab world in late 2010 and early 2011, which provided the exiled leadership with a sudden opportunity to re-engage with domestic dissent.

124. The Muslim Brotherhood remobilized and moved to consolidate political and military power among the opposition, establishing recruitment offices in rebel-held areas of Syria.

125. By the winter of 2011, with the active financial support of Qatar, the Syrian Muslim Brotherhood assumed a leading role in the Syrian National Council, an umbrella group comprised of anti-Assad factions. However, the political opposition was later eclipsed by the rise of dominant jihadist factions like ISIS and ANF.

### B. AQI AND ITS SUCCESSORS, ISIS AND ANF

126. AQI, ISIS, and ANF are a single terrorist lineage.

127. AQI metastasized into ISIS: the same organization, under the same leadership, has operated successively as Jama'at al-Tawhid wa'al-Jihad, al-Qaeda in Iraq ("AQI"), the Islamic State of Iraq, the Islamic State of Iraq and Syria ("ISIS"), and the Islamic State of Iraq and the Levant ("ISIL"), and the United States has designated it as an FTO continuously since October 2004 under each of those names.

128. ANF is AQI's Syrian offshoot: AQI created it in 2011; the United States designated it as an alias of AQI in December 2012; and after ANF refused to fold back into ISIS in 2013, the United States designated it as a separate FTO in its own name in May 2014.

129. The origins of ISIS and ANF trace to Abu Musab al-Zarqawi, a Jordanian terrorist who created a training camp in Afghanistan at Osama bin Laden's invitation. By the time of the September 11, 2001, terrorist attacks, Zarqawi had trained several thousand terrorists and established a terrorist network in Iraq, Syria, and other countries in the Middle East and Africa.

130. On or about October 15, 2004, the U.S. Secretary of State designated the Zarqawi terrorist network as an FTO under 8 U.S.C. § 1189, under the name Jama'at al-Tawhid wa'al-Jihad.[6]

131. On or about the same day, the U.S. Secretary of State also designated Jama'at al-Tawhid wa'al-Jihad under Executive Order No. 13224 as a Specially Designated Global Terrorist ("SDGT").[7]

132. In or around October 2004, Zarqawi formally pledged allegiance to al-Qaeda and renamed his terrorist network al-Qaeda in Iraq, i.e., AQI. By then, Zarqawi and his organization were among the most prominent terrorists attacking Americans in Iraq and elsewhere.

133. In December 2004, the State Department amended the SDGT and FTO designations of Jama'at al-Tawhid wa'al-Jihad to add the name Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn (i.e., al-Qaeda in Iraq) and related aliases, confirming that AQI and the previously designated Zarqawi network were one and the same organization.[8]

134. A U.S. airstrike killed Zarqawi in June 2006. But AQI continued after his death as a formidable terrorist group waging a violent campaign against the United

---

[6] Designation of Jam'at al Tawhid wa'al-Jihad, Also Known as the Monotheism and Jihad Group, Also Known as the al-Zarqawi Network, Also Known as al-Tawhid, as a Foreign Terrorist Organization Pursuant to Section 219 of the Immigration and Nationality Act, 69 Fed. Reg. 61,292, 61,292 (Oct. 15, 2004).

[7] Determination Pursuant to Section 1(b) of Executive Order 13224 Relating to the Designation of Jam'at al Tawhid wa'al-Jihad, Also Known as the Monotheism and Jihad Group, Also Known as the al-Zarqawi Network, Also Known as al-Tawhid, 69 Fed. Reg. 61,292, 61,292 (Oct. 15, 2004).

[8] Public Notice 4915, Determination Pursuant to Section 1(b) of Executive Order 13224 Relating to the Designation of Jam'at al Tawhid wa'al-Jihad, 69 Fed. Reg. 70,498 (Dec. 6, 2004); Public Notice 4936, Foreign Terrorists and Terrorist Organizations; Designation: Jam'at al Tawhid Wa'al-Jihad et al., 69 Fed. Reg. 75,587 (Dec. 17, 2004).

States.

135. In 2010, a new AQI leader – Abu Bakr al-Baghdadi – took control of the AQI terrorist network. Baghdadi eventually became the world's most-wanted terrorist mastermind, with the U.S. government at one point offering a record-breaking $25 million reward for information leading to his capture.[9]

136. In January 2012, the Secretary of State reviewed and maintained AQI's FTO designation and amended AQI's FTO and SDGT designations to add the alias "Islamic State of Iraq," a name under which AQI had operated since 2006.[10]

137. In early 2011, shortly after Baghdadi's emergence, Syria spiraled into civil war.

138. Many terrorist groups and other armed factions began vying for power, precipitating a near-total breakdown in Syrian governance and other civil institutions.

139. At this point in time, Qatar switched allegiances. Until 2011, the Syrian regime was largely aligned with Qatar and supported AQI's efforts to fight U.S. forces in Iraq, but once civil war broke out in Syria, Qatar reverted to its traditional support of Muslim Brotherhood-aligned groups which formed a substantial part of the anti-Assad regime forces.[11]

140. Accordingly, as discussed below, from 2011 onward, the Defendants

---

[9] While in graduate school at Iraq's Saddam University for Islamic Studies, Baghdadi joined the Muslim Brotherhood. After the 2003 U.S. invasion of Iraq, Baghdadi founded the militant Sunni group Jamaat Jaysh Ahl al-Sunnah wa-l-Jamaah before being imprisoned in a U.S. detention center where he met other prisoners who would later form the core senior leadership of ISIS. Following his release, Baghdadi became a top official of AQI.

[10] Public Notice 7774, Review and Amendment of the Designation of al-Qa'ida in Iraq, et al. as a Foreign Terrorist Organization, 77 Fed. Reg. 4,082 (Jan. 26, 2012); Amendment of the Designation of al-Qa'ida in Iraq as a Specially Designated Global Terrorist Entity, 77 Fed. Reg. 4,083 (Jan. 26, 2012).

[11] The Assad regime was dominated by the minority Alawite sect which many Sunni Muslims, including the Muslim Brotherhood, consider heretics.

provided substantial assistance to AQI, the terrorist organizations that evolved from it, and other Muslim Brotherhood-aligned splinter groups.

141. In late 2011, sensing the opportunity amid the chaos, Baghdadi sent an AQI operative named Abu Muhammad al-Julani ("Julani," now known by his real name, Ahmed al-Sharaa, the current President of Syria) to establish an AQI branch in Syria. Baghdadi also sent Abu Muhammad al-Adnani (who would later lead ISIS's global Intelligence Cell) to assist Julani.

142. The resulting Syrian branch of AQI was called the Al-Nusrah Front, i.e., ANF, which publicly announced its formation in January 2012.

143. By the end of 2012, the U.S. government recognized ANF as AQI's Syrian branch.

144. On December 11, 2012, the Secretary of State amended the FTO and SDGT designations of AQI to include the following aliases: Al-Nusrah Front, Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, and Al-Nusrah Front for the People of the Levant.[12]

145. At the time, the State Department reported that ANF had already claimed responsibility for nearly 600 terrorist attacks throughout Syria.

146. The State Department characterized ANF as carrying out AQI's campaign to "hijack the struggles of the Syrian people for its own malign purposes."[13]

### C. ISIS

147. In April 2013, reflecting AQI's expansion into Syria — and in an unsuccessful attempt to reabsorb ANF, as described below — Baghdadi changed the

---

[12] Public Notice 8104, Amendment of the Designation of al-Qa'ida in Iraq as a Foreign Terrorist Organization, 77 Fed. Reg. 73,732 (Dec. 11, 2012); Public Notice 8105, Amendment of the Designation of al-Qa'ida in Iraq as a Specially Designated Global Terrorist Entity, 77 Fed. Reg. 73,732 (Dec. 11, 2012).

[13] Press Statement, U.S. Dep't of State, *Terrorist Designations of the al-Nusrah Front as an Alias for al-Qa'ida in Iraq* (Dec. 11, 2012), https://2009-2017.state.gov/r/pa/prs/ps/2012/12/201759.htm.

name of the Islamic State of Iraq (i.e., AQI) to the Islamic State of Iraq and Syria, i.e., ISIS.

148. Effective May 15, 2014, the Secretary of State again amended AQI's FTO designation. This time the amendment listed the "Islamic State of Iraq and the Levant" as the organization's primary name, which is why U.S. government documents sometimes refer to the organization with the shorthand "ISIL."[14]

149. The same amendment removed the ANF aliases that had been part of AQI's designation since December 2012.

150. On September 30, 2015, the Secretary of State amended that same designation to add more aliases: Islamic State, ISIL, and ISIS.[15]

151. Concurrently, the Secretary of State separately designated ANF as its own FTO and SDGT.[16]

152. Accordingly, at all times from December 11, 2012, through May 14, 2014, ANF was designated as an FTO and SDGT as part of AQI, and from May 15, 2014, onward ANF was separately designated as an FTO and SDGT in its own name. At all times relevant to this Complaint, both ANF and ISIS were therefore designated FTOs, and ISIS's designation traces back to AQI's original 2004 designation.

153. Following ANF's later rebranding as Hay'at Tahrir al-Sham ("HTS") and its seizure of power in Syria in December 2024, the Secretary of State revoked ANF's FTO designation effective July 8, 2025. That revocation has no bearing on this action: by statute, the revocation of an FTO designation "shall not affect any action or

---

[14] Public Notice 8732, Amendment of the Designation of al-Qa'ida in Iraq, 79 Fed. Reg. 27,972, 27,972 (May 15, 2014).

[15] Public Notice 9290, Amendment of the Designation of Islamic State of Iraq and the Levant, 80 Fed. Reg. 58,804, 58,805 (Sept. 30, 2015).

[16] Public Notice 8733, Amendment of the Designation of al-Qa'ida in Iraq, 79 Fed. Reg. 27,972, 27,973 (May 15, 2014); Public Notice 8734, Designation of Al-Nusrah Front, 79 Fed. Reg. 27,972, 27,972 (May 15, 2014) (FTO); Public Notice 8735, Designation of Al-Nusrah Front as a Specially Designated Global Terrorist, 79 Fed. Reg. 27,972, 27,973 (May 15, 2014).

proceeding based on conduct committed prior to the effective date of such revocation." 8 U.S.C. § 1189(a)(7). The Attacks at issue here occurred before the revocation.

154. ISIS and ANF, like their predecessor AQI, very publicly targeted U.S. citizens to advance their terrorist objectives.

155. AQI's founding purpose was to wage a terrorist campaign to expel U.S. forces from Iraq and from the broader Middle East.

156. To that end, AQI's terrorist campaign openly targeted Americans, perpetrating many attacks against U.S. and coalition forces in Iraq and forcing the U.S. military to engage in near-daily combat with AQI terrorists.

157. As one DOD report observed in 2006, AQI quickly achieved high-profile "success" in Iraq by "inflicting American casualties (and, thus, demonstrating US vulnerability)" while "portraying the United States and its allies as new 'crusaders' that threaten the very survival of Islam."

158. After U.S. forces withdrew from Iraq in 2011, AQI and its successors ISIS and ANF "continued to plot attacks against U.S. persons and interests in Iraq and the region – including the brutal murder of kidnapped American citizens in Syria and threats to U.S. military personnel in Iraq."[17]

159. ISIS also periodically released "kill lists" publicly broadcasting the names of hundreds of U.S. citizens whom it encouraged its operatives and followers to execute around the globe. It too often succeeded in murdering Americans.

160. ISIS and ANF publicly proclaimed their intent to commit acts of terrorism against the United States.

161. For example, in a 33-minute audio statement released on July 21, 2012,

---

[17] Stephen W. Preston, Gen. Counsel, U.S. Dep't of Def., *The Legal Framework for the United States' Use of Military Force Since 9/11*, Address at the Annual Meeting of the American Society of International Law (Apr. 10, 2015) (transcript available at https://www.war.gov/News/Speeches/Article/606662/the-legal-framework-for-the-united-states-use-of-military-force-since-911/).

Baghdadi discussed a wave of AQI attacks and threatened to strike at the "heart" of America, warning the United States: "You will soon witness how attacks will resound in the heart of your land, because our war with you has now started."

162. ISIS and ANF made good on those promises by escalating their predecessor's terrorist campaign against the United States. ISIS's abduction and murder of two U.S. journalists – James Foley and Steven Sotloff – are perhaps the most infamous examples. ISIS beheaded both men on camera and globally publicized their brutal executions in videos that ISIS titled "A Message to America" and "A Second Message to America," respectively.

163. Disseminating those "messages" supported two terroristic aims. ISIS committed heinous public murders of U.S. journalists both to "horrify Americans to discourage increased U.S. military involvement" and to "spur potential recruits to join in the carnage and incite additional terrorist attacks against the United States."[18]

**D. AL NUSRA FRONT**

164. ANF emerged in early 2012 as a Sunni jihadist movement in Syria. While its core ideology was deeply influenced by the same currents that ultimately fueled al-Qaeda and ISIS, its immediate, proximate origin was as a direct outgrowth of AQI.

165. As described above, ANF began in late 2011 as a small unit of AQI fighters that Baghdadi dispatched into Syria under Julani's command to capitalize on the country's brewing civil war. That unit gathered enough local support to publicly declare ANF's formation by January 2012.

166. In April 2013, Baghdadi announced that ANF would be merged back into AQI under AQI's new name, ISIS.

167. Julani rejected the merger, and Baghdadi's organization proceeded as ISIS without ANF.

---

[18] James Phillips, *The Message ISIS Wants to Send to America, the World*, Heritage Found. (Sept. 10, 2014), https://www.heritage.org/defense/commentary/the-message-isis-wants-send-america-the-world.

168. Julani opted to break away, a move that reflected the growing rivalries among jihadists. ANF instead reaffirmed allegiance to al-Qaeda's central leadership. ANF and ISIS thereafter competed militarily for the same turf in northern Syria, although, as discussed below, they also fought side by side when it suited them.

169. The Syrian branch of the Muslim Brotherhood defended ANF in December 2012 after the United States designated it as an alias of AQI.

170. Farouk Tayfour, then the Syrian Brotherhood's deputy leader, called the designation "very wrong and too hasty" given what he called the "grey atmosphere" at the time in Syria. According to Tayfour, the Syrian people view ANF as a reliable defense against "the regular army and Assad's gangs."

**E. TERROR FINANCING IN QATAR**

171. When Sheikh Hamad bin Khalifa Al Thani seized power in a 1995 palace coup in Qatar, he and his powerful Foreign Minister/Prime Minister Sheikh Hamad bin Jassim bin Jaber Al Thani made a strategic calculation to cultivate the Muslim Brotherhood more extensively as a foreign-policy asset, hosting and funding Brotherhood-linked scholars, media figures, and eventually political leaders in exile as a way to project regional influence.

172. The following year, Qatar launched Al Jazeera, under royal patronage, which gave Brotherhood-aligned clerics and operatives a new broadcast platform.

173. Qatar Charity and related institutions were also established and served as a key Gulf-based fundraising network tied to Hamas and other Brotherhood-linked terrorist groups.

174. As early as December 2009, a U.S. State Department cable described Qatar as having adopted "a largely passive approach" to cooperating with the United States against terrorist financing and assessed Qatar's overall counterterrorism cooperation with the United States as "the worst in the region."[19]

---

[19] Cable from Hillary Rodham Clinton, Sec'y of State, U.S. Dep't of State, to Various U.S. Embassies, Terrorist Finance: Action Request for Senior Level Engagement on

175. Qatar remained a notoriously permissive terrorist-financing jurisdiction throughout the Relevant Period.

176. In March 2014, then-U.S. Under Secretary for Terrorism and Financial Intelligence, David Cohen, highlighted Qatar as a permissive jurisdiction for terrorist financing, stating that "a number of fundraisers in more permissive jurisdictions-particularly in Kuwait and Qatar - are soliciting donations to fund extremist insurgents, not to meet legitimate humanitarian needs. The recipients of these funds are often terrorist groups, including al-Qaeda's Syrian affiliate, al-Nusrah Front, and the Islamic State of Iraq and the Levant (ISIL), the group formerly known as al-Qaeda in Iraq (AQI)."

177. Private fundraising networks in Qatar, for instance, increasingly relied upon social media to solicit donations for terrorists and to communicate with both donors and recipient radicals on the battlefield. This method became so lucrative, and Qatar was such a permissive terrorist financing environment, that several major Qatar-based fundraisers acted as local representatives for larger terrorist fundraising networks that were based in Kuwait.

178. Numerous examples of Qatari regime oversight failures and lack of enforcement against FTO operatives include:

- An al-Qaeda leader and co-founder of AQI, Muhammad al-Othamin, fled to Qatar in 2004 from where he continued to serve as a financial and logistical facilitator for AQI, before establishing an al-Qaeda-affiliated militia in Syria in 2011.

- Qatar harbored its national, Abdallah Ghanim Khawar, who was sanctioned by the U.S. government in July 2011 for facilitating support to al-Qaeda elements in Iran.

---

Terrorism Finance, No. 09STATE131801 (Dec. 30, 2009), https://wikileaks.org/plusd/cables/09STATE131801_a.html (further observing that "al-Qaeda, the Taliban, UN-1267 listed LeT, and other terrorist groups exploit Qatar as a fundraising locale").

- Qatar failed to disrupt the terrorist-support activities of UN- and U.S.-designated al-Qaeda financier Khalifa al-Subaiy, who continued to operate from Doha after his designation, despite assurances by the Qatari government. Al-Subaiy publicly supported fundraising initiatives for ANF and other jihadist terrorist organizations in Syria, alongside a network of known al-Qaeda supporters in Qatar.

- Qatar failed to act against Doha-based financier Abd al-Rahman al-Nu'aymi, despite his being sanctioned by the UN and the U.S. government. After his designation, al-Nu'aymi was allowed to travel outside of Qatar to meet with other al-Qaeda supporters and issued public statements calling for support to jihadist fighters in Syria.

179. Crucially, during the Relevant Period, Qatar permitted open and public fundraising campaigns on behalf of jihadist terror organizations operating in Syria.

180. Qatar-based financiers and facilitators Sa'ad al-Ka'bi, Abd al-Latif al-Kawari, and Muhammad Jassim al-Sulaiti all openly solicited or facilitated funds for al-Qaeda, ANF, or ISIS. [20]

181. Additionally, Muhammad bin Hashim al-Awadhy, the son of a prominent Qatari real estate developer and "philanthropist," led a campaign to financially support ISIS called "Wa Atasemo for the Relief of Our People in Syria."

182. Much of this fundraising activity was conducted under the rubric of the "Madad Ahl al-Sham Campaign for Syria." This organization was heavily promoted online and via social media under the guise of an Islamic humanitarian aid effort for Syrian refugees.

183. As discussed below, Defendants' activities in support of AQI, ANF, and

---

[20] U.S. Dep't of the Treasury, Press Release, *Treasury Designates Financial Supporters of Al-Qaida and Al-Nusrah Front* (Aug. 5, 2015) (designating al-Ka'bi and al-Kawari as SDGTs). According to Treasury, as of early 2014 al-Ka'bi had set up donation campaigns in Qatar in response to an ANF associate's request for money to purchase weapons, and, at ANF's request, worked to facilitate a ransom payment for a hostage held by ANF — the same ransom-for-hostages model described below.

ISIS in Syria constituted part of the more clandestine side of Qatari efforts to support the Muslim Brotherhood-aligned groups seeking to overthrow the Syrian regime.

### F. MOUTAZ AND RAMEZ AL-KHAYYAT AND UCC KNOWINGLY AND SUBSTANTIALLY ASSISTED ISIS AND THE AL NUSRA FRONT

184. Because Moutaz and Ramez Al-Khayyat were Syrian nationals with extensive business interests in Syria and a close family member within the inner circle of the Assad regime (their uncle, Muhammad Hamsho), they were uniquely placed to serve as a conduit to the Syrian-based terrorist organizations fighting the Syrian government.

185. Moutaz and Ramez Al-Khayyat's Syrian nationality and family ties made it natural for them to travel back and forth from Qatar to Syria.

186. Their transfer of large sums of money into Syria did not initially raise suspicions because of their extensive business interests in Syria, including ongoing construction projects, and their uncle's role as a highly placed official within the Assad regime further allayed concerns, despite a few public statements that may have alerted Syrian intelligence services to the brothers' true sympathies.

187. In addition to their ideological preference and support for al-Qaeda in its variant forms (AQI, ISIS, ANF), the Al-Khayyat brothers immediately recognized and exploited the advantages of exchanging the patronage of the Assad regime for the far more lucrative patronage of the Qataris.[21]

188. Thus, although they arrived in Qatar in 2010-2011 as foreign nationals (foreign residents invariably enjoy inferior status to the relatively small indigenous Qatari population), the Al-Khayyat brothers rapidly built their construction empire in less than five years – largely because of immensely lucrative government contracts.

189. Particularly in their early years, the Al-Khayyat brothers obtained

---

[21] For the Al-Khayyat brothers and their benefactors, all streams of the Muslim Brotherhood were worthy of support, notwithstanding those groups' internal disagreements.

contracts whose scope and complexity far exceeded their capabilities and expertise.

190. This most-favored status was a direct result of their ability to travel to Syria and serve as a key lifeline to the terrorist organizations supported by their sympathizers in Qatar and the other Persian Gulf states.

191. The Al-Khayyat brothers used their company, UCC, and its bank accounts at Doha Bank and Qatar National Bank in Qatar, to help facilitate their transfers of large sums to ISIS and ANF.

192. One of the main mechanisms deployed was for the Al-Khayyat brothers to direct UCC to submit winning bids for various large construction projects – bids that contained collusive overbilling.[22]

193. In other words, by agreement, the contracts secured by UCC contained inflated costs that would provide excess funds that Defendants could transfer to Syria and ultimately deliver to Muslim Brotherhood-aligned groups seeking to overthrow the Syrian regime, including AQI and later ISIS and ANF.

194. These contracts often contained no proper provision of performance guarantees by the Al-Khayyat brothers' companies (primarily UCC), the use of cheap materials in contravention of the contract stipulation, inflated contract pricing, and advance payments made without any justification.

195. Again, by agreement, UCC would not retain these excess profits but would route them to Syria under the guise of paying expenses for ongoing projects in that country.

196. According to published reports,[23] the Al-Khayyat brothers' personal

---

[22] A project called Banana Island (which involved the construction of a resort island off the coast of Qatar) was one such contract.

[23] The published report quotes Doha Bank employees and cites to 2011-2012 internal e-mails between Doha Bank employees (Nabil Tabbara and Rim el-Hajjeh) and the Al-Khayyat brothers discussing the brothers bringing bulk cash to Turkey for transit across the border into Syria. Another published document from the Homs governorate in Syria lists an asset freeze that included the Al-Khayyat brothers and both Nabil

accounts at Doha Bank received an average of more than $8 million per week in Qatari Riyals that was partially converted to cash (likely in U.S. dollars) and siphoned off to be delivered first to Turkey and Lebanon and then across the border to Syria to buy weapons and send cash to ISIS and ANF.

197. The collusive contracts were priced in Qatari Riyal, but that currency was not negotiable in Syria, so in order to provide meaningful funding to ISIS and ANF, the funds had to be converted into Syrian lira, Euros or U.S. dollars.

198. Moreover, because large transfers were often converted into bank notes and the Al-Khayyat brothers did not welcome the scrutiny of the Syrian government, international funds transfers through banks utilized institutions in Turkey and Lebanon where branches could be accessed near the Syrian border.

199. While the Al-Khayyat brothers moved some bank notes by courier, many of their "donations" to ISIS and ANF first travelled through the global financial system (converting Qatari Riyal to U.S. dollars in the United States) before ultimately reaching Syria in the form of U.S. bank notes.

200. Moreover, because (at least initially) the Al-Khayyat brothers could easily travel to Syria, they were able to provide operational cover for the importation of weapons for ISIS and ANF.

201. For this purpose, the Al-Khayyat brothers recruited local operatives who were either connected to Muslim Brotherhood- and al-Qaeda-affiliated groups or were identified as individuals involved in smuggling and/or arms trafficking.

202. Roduan Kharoub was one of the Lebanese operatives recruited by Ramez Al-Khayyat.

203. Before being approached by a local representative of ANF, Kharoub had been arrested in 2012 by the Lebanese military intelligence on warrants relating to arms sales within Lebanon.

---

Tabbara and Rim el-Hajjeh.

204. Kharoub later described his recruitment and his first direct interaction with Ramez Al-Khayyat in October 2013, when he drove Ramez Al-Khayyat from Beirut by car across the Syrian border with 25 packets, each containing $10,000 — a total of $250,000 in cash. The purpose of his travel was to deliver the money to his contact, a man known locally as "Abu Obeida," who was a member of ANF, and to Abu Malik al-Telli (a/k/a Jamal Zainiyah or Jamal Zayneye), an ANF leader in the Qalamoun region along the Syrian-Lebanese border.

205. Roduan Kharoub later made multiple trips to Syria with Ramez Al-Khayyat including one in March 2014, when they visited one of the Al-Khayyat brothers' weapons factories, not far from Rankous, a town 45 km north of Damascus.

206. Ramez Al-Khayyat toured one particular factory with Kharoub. It manufactured car bombs and other improvised explosive devices (IEDs) and stored large quantities of ammunition and cabling for fuses. The factory also cast mortars from molten metal.

207. Car bombs, IEDs, and mortars were signature weapons of ANF's campaign in Syria, and they are precisely the types of weapons ANF used to kill and maim civilians in attacks like those that killed Plaintiff Sameer E. Shamon's wife and injured Plaintiffs Maryam Shahadeh and Anees Rahmoun and their family members.

208. Ramez Al-Khayyat expressed satisfaction with the manufacturing process but stated that the factory was suffering from a shortage of plastic explosives.

209. According to Roduan Kharoub, for a short time after March 2014, Ramez Al-Khayyat communicated with him via a burner phone and put him in touch with a Lebanese Druze arms trafficker.

210. In most cases, Ramez Al-Khayyat tasked him with delivering $100,000 or more at a time (in bank notes) to Abu Obeida in or around Arsal, Lebanon (where ANF and ISIS later battled the Iranian-backed Lebanese FTO Hezbollah in the summer of 2014).

211. On one occasion, Ramez Al-Khayyat instructed him to collect a

consignment of plastic explosives from the airport and deliver them to the factory near Rankous.

212. On other occasions, Roduan Kharoub was asked to arrange the delivery of heavy machinery, including heavy presses and old trucks, to the factory. Kharoub states that he did not do this himself but arranged and paid truckers to do it with money Ramez Al-Khayyat provided for that purpose.[24]

213. The ANF and ISIS were partially pushed out of the Qalamoun region proper, where Rankous is situated, by a combination of the Syrian Army and Hezbollah forces who launched an offensive around April 2014. ANF and ISIS then retreated both into the surrounding mountains and into eastern Lebanon around Arsal.[25]

214. This development undoubtedly set back the Al-Khayyat brothers' weapons manufacturing efforts in the region, and the discovery of the factories may have further confirmed Syrian government suspicions about their role in supporting anti-Assad regime forces.

215. In any event, Ramez Al-Khayyat and his father were convicted of supporting terrorist organizations and Ramez was sentenced to death in absentia. The Syrian government also took other legal actions against both Ramez and Moutaz Al-Khayyat, including freezing their remaining assets in Syria.

216. Despite their in-person activities crossing into Syria, the Al-Khayyat brothers generally delegated the delivery of money and weapons to surrogates in

---

[24] Sometime after April 2014, Roduan Kharoub became convinced that Ramez Al-Khayyat had ordered his assassination, noting that many other Lebanese contacts aware of the factory operation near Rankous had been killed and he had been (unsuccessfully) ambushed in a roadside shooting around the same time. At the end of October 2018, a military tribunal in Lebanon sentenced Kharoub to death in absentia for allegedly planning and carrying out acts of terrorism.

[25] Although ANF was the more dominant jihadist organization in the Qalamoun region at that time, both ANF and ISIS fought jointly against the Lebanese Army and Hezbollah in August 2014 in and around Arsal.

Lebanon and Turkey for transfer to ANF and ISIS.

217. In addition to moving bulk cash and weapons to ISIS and ANF, the Al-Khayyat brothers were also involved in another funding mechanism that helped these organizations.

218. Both ISIS and ANF raised significant revenue from seizing hostages and extorting ransom payments.

219. As pressure mounted from the U.S. and elsewhere for Qatar to shut down overt fundraising campaigns for ISIS and ANF, Qatari supporters of these jihadist organizations used their connections with the groups to serve as "mediators."

220. Ostensibly, ANF and ISIS would kidnap people in Syria – foreign aid workers, journalists, local nuns – and then Qatari representatives would offer either to mediate the negotiations or help pay the ransom as a "humanitarian gesture."

221. For example, in December 2013, ANF abducted thirteen Greek Orthodox nuns from the historic Christian town of Maaloula and held them for three months before releasing them in March 2014 in a deal brokered with Qatari involvement.

222. In August 2014, ANF released American journalist Peter Theo Curtis, whom it had held and tortured for nearly two years, following Qatari mediation.

223. Behind the scenes, the Al-Khayyat brothers would help orchestrate the phony negotiations and arrange for the payments from Qatar to ANF and ISIS warlords, using largely the same methods and routes used by the prior construction payment scam.[26]

224. It is indicative of the importance of the services the Al-Khayyat brothers rendered to ISIS and ANF that their companies emerged in a short period of time as one of the leading firms in Qatar and eventually became a key beneficiary of the

---

[26] Ramez Al-Khayyat was also tasked with bribing the foreign negotiators when that was necessary to ensure the right outcome of a hostage negotiation, i.e., the delivery of large sums of money to ANF in a manner that plausibly suggested arm's-length negotiations.

country's 2022 World Cup construction boom.

225. Even more so, the Al-Khayyat brothers' recent success in winning bids on leading projects in Syria under the new Syrian government led by ANF's founder, al-Sharaa, speaks to their long-standing and crucial relationship with ANF's leadership when the terrorist organization needed their (and their benefactors') assistance most.

**G. ISIS AND ANF'S SYSTEMATIC CAMPAIGN OF ABDUCTION, TORTURE, AND MASS MURDER, AND THE ATTACKS THAT INJURED PLAINTIFFS**

226. The Attacks were not isolated acts of violence. They were part of a deliberate, widespread, and systematic campaign of abduction, torture, execution, bombing, and terror that ISIS and ANF waged against civilians in Syria, in Iraq, and beyond — a campaign that the money, weapons, and ransom-facilitation services Defendants provided were intended to, and did, sustain.

227. Kidnapping was a core instrument of both organizations. ISIS and ANF seized civilians at checkpoints, from their homes, and off the street, and used abduction to extract ransom, to eliminate perceived opponents, to punish alleged violations of their religious edicts, and to terrorize entire communities into submission.

228. In December 2013, Amnesty International documented that ISIS operated at least seven secret detention facilities, in Raqqa governorate and Aleppo, where detainees — including children — were tortured, flogged, and summarily killed. Among those ISIS abducted and imprisoned were people accused of religious offenses such as consuming alcohol — the very pretext on which ISIS abducted, detained, and tortured Plaintiff Mohamad Aloqdeh in September 2013.[27]

229. In November 2014, the United Nations Independent International

---

[27] Amnesty Int'l, *Rule of Fear: ISIS Abuses in Detention in Northern Syria* (Dec. 19, 2013), https://www.amnesty.org/en/documents/mde24/063/2013/en/.

Commission of Inquiry on the Syrian Arab Republic concluded that ISIS had committed murder, torture, enforced disappearance, and other inhumane acts as part of a widespread and systematic attack against the civilian populations of the Aleppo, Raqqa, Al-Hasakah, and Deir ez-Zor (also spelled Dayr Az-Zawr) governorates — the same governorates in which ISIS abducted, tortured, and murdered Plaintiffs and their family members. The Commission found that public executions, amputations, and floggings had become routine in ISIS-controlled areas, and that ISIS displayed its victims' bodies publicly as a warning to local residents.[28]

230. In August 2014 — the same month ISIS abducted the son of Plaintiff Etab Hrieb in Deir ez-Zor — ISIS massacred hundreds of members of the al-Shaitat tribe in Deir ez-Zor governorate, most of them civilians and many of them by beheading.

231. ISIS singled out Christians for persecution. In February 2014, ISIS imposed on the Christians of Raqqa a so-called "dhimmi" pact requiring them to pay a special tax, forgo public worship, and submit to ISIS rule on pain of death — the same campaign of religious persecution in which ISIS abducted and tortured Plaintiff Afram Merjan's brother, Hanna Daniel Merjan, in Al-Hasakah governorate because he refused to convert. The U.S. Secretary of State later formally determined that ISIS was responsible for genocide against Christians, Yazidis, and Shia Muslims in areas under its control.[29]

232. That persecution extended to the Assyrian Christians of Iraq and northeastern Syria. In the summer of 2014, ISIS attacked the Christian towns of Iraq's Nineveh Governorate. On February 23, 2015, ISIS attacked the Assyrian Christian

---

[28] Indep. Int'l Comm'n of Inquiry on the Syrian Arab Republic, *Rule of Terror: Living Under ISIS in Syria* (Nov. 14, 2014), *available at* https://www.ohchr.org/sites/default/files/documents/hrbodies/hrcouncil/coisyria/HRC_CRP_ISIS_14Nov2014.pdf.

[29] John Kerry, Sec'y of State, U.S. Dep't of State, Remarks on Daesh and Genocide (Mar. 17, 2016), https://2009-2017.state.gov/secretary/remarks/2016/03/254782.htm.

villages along the Khabur River in Al-Hasakah Governorate, Syria, abducting scores of civilians — including Plaintiffs Youkhna Amo, Chamoun Lazar, Lazar Odicho, and Cherina Younan and Plaintiff Madlen Tammo's mother, Iniar Abdal — and killing others, including George Younan, the husband of Plaintiff Jamila Isaak and father of Plaintiff Sharlet Younan.

233. ANF, for its part, made suicide and vehicle-borne bombings a signature of its campaign in Syria, deliberately detonating car bombs in crowded civilian areas, including in Damascus and its suburbs. ANF's bombings and shelling were designed to kill and maim indiscriminately, spraying shrapnel through bystanders — exactly the type of attack that killed Plaintiff Sameer E. Shamon's wife in Jaramana and that maimed Plaintiffs Maryam Shahadeh's and Anees Rahmoun's family members. ANF likewise abducted and murdered civilians, including the brother of Plaintiff Ghazalah Alhamoud.

234. For the families of those whom ISIS and ANF abducted and never returned — including those of Plaintiffs Hilin Shikhani and Raiefa Moslim — the injury is ongoing. Neither organization accounted for the fate of most of its captives or returned their remains. These families have been denied the knowledge of whether, when, and how their loved ones died, and the ability to recover and bury them, and they continue to endure the anguish of unresolved loss.

235. Plaintiffs who were themselves abducted, beaten, tortured, or maimed — including Plaintiffs Safwan Shoufan, Mohamad Aloqdeh, Maryam Shahadeh, Anees Rahmoun, Youkhna Amo, Chamoun Lazar, Lazar Odicho and Cherina Younan — suffered physical pain and injury and the terror of being at the mercy of organizations that routinely tortured and executed their captives, and they continue to suffer the lasting physical and psychological consequences of the Attacks.

236. Each of the Attacks was committed, planned, and/or authorized by ISIS or ANF, each of which was, at the time of the Attack in question, a designated FTO (or, as to ANF before May 15, 2014, part of a designated FTO, AQI).

## CLAIMS FOR RELIEF

## CLAIM ONE

## AIDING AND ABETTING DESIGNATED FOREIGN TERRORIST ORGANIZATIONS IN VIOLATION OF 18 U.S.C. § 2333(d)(2)

237. Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

238. Plaintiffs assert this cause of action against Defendants under 18 U.S.C. § 2333(d)(2), which provides for liability (in an action under 18 U.S.C. § 2333(a) involving acts of international terrorism by a designated Foreign Terrorist Organization), against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism."

239. Plaintiffs are nationals of the United States who were injured in their persons and/or property by reason of acts of international terrorism.

240. At the time each Attack was committed, planned, and/or authorized, the organization responsible for it — ISIS or ANF — was designated as an FTO under 8 U.S.C. § 1189, either in its own name or, in the case of ANF from December 11, 2012 through May 14, 2014, as part of AQI.

241. The Attacks were acts of international terrorism as defined by 18 U.S.C. § 2331(1). Each Attack (a) involved violent acts and acts dangerous to human life — including murder, kidnapping and hostage-taking, torture, and bombing — that violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 1111, 1201, 1203, 2332, 2332a, and 2332f; (b) appeared to be intended to intimidate or coerce a civilian population, to influence the policy of a government by intimidation or coercion, and to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (c) occurred primarily outside the territorial jurisdiction of the United States and transcended national boundaries in

terms of the persons the Attacks were intended to intimidate and coerce.

242. Defendants knowingly provided substantial assistance to ANF and ISIS.

243. Defendants knowingly provided ANF and ISIS substantial assistance which included: (a) tens of millions of dollars in funds, including U.S. bank notes obtained by converting Qatari Riyals into U.S. dollars through the U.S. financial system; (b) weapons and explosives, including car bombs, IEDs, and mortars manufactured at facilities Defendants owned, funded, and supervised; (c) the facilitation of ransom payments to ANF and ISIS for hostages those organizations had kidnapped; and (d) operational cover for the importation of weapons and the movement of bulk cash into Syria — all of which was essential to, and foreseeably used in, ANF's and ISIS's campaigns of kidnapping, bombing, torture, and murder, including the Attacks.

244. Defendants' assistance was substantial under every relevant measure. The acts Defendants assisted — kidnapping, bombing, and murder — were precisely what money and weapons in the hands of ANF and ISIS were meant to accomplish. The assistance was enormous in amount, consisting of tens of millions of dollars, bulk U.S. currency, and weapons production. Defendants were personally present for key transfers: Ramez Al-Khayyat personally carried $250,000 in cash across the Syrian border for delivery to an ANF operative and to ANF leader Abu Malik al-Telli, and personally toured a weapons factory producing car bombs, IEDs, and mortars. Defendants' relationship with ANF's leadership was direct and enduring, and their assistance continued for years, throughout the Relevant Period.

245. Defendants' assistance was neither passive nor arm's-length, and it was not the provision of routine services generally available to the public. Defendants consciously and intentionally channeled money, weapons, and ransom payments to ANF and ISIS — organizations whose very reason for existing was terrorist violence — and thereby knowingly and substantially assisted the kidnappings, bombings, and killings those organizations carried out, including the Attacks.

246. At the time Defendants provided substantial assistance to ANF and ISIS, they knew that: (a) AQI — the organization from which ANF and ISIS emerged — had been designated as an FTO since 2004, and ANF and ISIS were themselves designated FTOs (or parts of one) during the Relevant Period of Defendants' assistance; (b) ANF and ISIS engaged in acts of international terrorism resulting in the murder of thousands of civilians and the kidnapping, torture, and maiming of countless more; and (c) clandestine funding was essential to ANF and ISIS's ability to perpetrate terrorist attacks.

247. Defendants also knew that attacks such as the Attacks, and injuries such as Plaintiffs', were the foreseeable results of their substantial assistance to ANF and ISIS.

248. Through their knowing and substantial assistance, Defendants consciously, voluntarily, and culpably participated in ANF's and ISIS's terrorist campaigns, including the Attacks, as something they wished to bring about, and sought by their actions to make those campaigns succeed.

249. Defendants are therefore jointly and severally liable to Plaintiffs for threefold the damages Plaintiffs sustained, in an amount to be determined at trial, and the cost of suit, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a).

## CLAIM TWO

## CONSPIRING WITH A DESIGNATED FOREIGN TERRORIST ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2333(d)(2)

250. Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

251. Plaintiffs assert this cause of action against Defendants under 18 U.S.C. § 2333(d)(2), which provides for liability (in an action under 18 U.S.C. § 2333(a) involving acts of international terrorism by a designated Foreign Terrorist Organization), against "any person … who conspires with the person who committed such an act of international terrorism."

252. Plaintiffs are nationals of the United States who were injured in their persons by reason of acts of international terrorism.

253. At the time each Attack was committed, planned, and/or authorized, the organization responsible for it — ISIS or ANF — was designated as an FTO under 8 U.S.C. § 1189, either in its own name or, in the case of ANF from December 11, 2012, through May 14, 2014, as part of AQI.

254. The Attacks were acts of international terrorism as defined by 18 U.S.C. § 2331(1), for the reasons stated in Claim One.

255. As set forth above, Defendants entered into an agreement with ANF and ISIS — including through direct dealings with ANF operatives and leaders such as Abu Obeida and Abu Malik al-Telli — and with other co-conspirators, including Qatari financiers and intermediaries, to arm, finance, and sustain those organizations' campaign of terrorist violence in Syria, with the shared objective of overthrowing the Syrian government through that violence.

256. Defendants' role in the conspiracy was to provide ANF and ISIS with at least tens of millions of dollars and weapons, to manufacture car bombs, IEDs, and mortars, and to facilitate ransom payments, in order to support those organizations' financial and physical terrorist infrastructure.

257. Plaintiffs' injuries were caused by unlawful overt acts — i.e., the Attacks — perpetrated by ANF and ISIS, which overt acts were done pursuant to and in furtherance of the common scheme.

258. The Attacks — kidnappings, bombings, torture, and killings of civilians in Syria — were within the scope of the conspiracy and were its natural and reasonably foreseeable consequence.

259. Defendants are therefore jointly and severally liable to Plaintiffs for threefold the damages Plaintiffs sustained, in an amount to be determined at trial, and the cost of suit, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a).

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs for:

(a) Compensatory damages in amounts to be determined at trial;

(b) Treble damages pursuant to 18 U.S.C. § 2333(a);

(c) Any and all costs sustained in connection with the prosecution of this action, including attorneys' fees pursuant to 18 U.S.C. § 2333(a);

(d) Prejudgment interest; and

(e) Such other and further relief as justice requires.

Dated: September 27, 2026

By /s/ Emilio A. Cazares

**TURNER & ASSOCIATES, P.A.**
Emilio A. Cazares; SBN 324810
Cassie N. Holloway; SBN 328284
C. Tab Turner (motion for admission pro hac vice forthcoming)
1001 B Ave, Suite 308
Coronado, CA 92118
Office: (619) 537-0007
Email: emilio@tturner.com
Email: cassie@tturner.com
Email: tab@tturner.com

*Attorneys for All Plaintiffs*

**OSEN LLC**
Gary M. Osen (motion for admission pro hac vice forthcoming)
Aaron Schlanger (motion for admission pro hac vice forthcoming)
190 Moore Street, Suite 272
Hackensack, NJ 07601
Office: (201) 265-6400
gosen@osenlaw.com
aschlanger@osenlaw.com

*Attorneys for All Plaintiffs*

**SPARACINO PLLC**
Ryan R. Sparacino (motion for admission pro hac vice forthcoming)
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Office: (202) 629-3530
ryan.sparacino@sparacinopllc.com

*Attorneys for Plaintiffs Madlen Tammo, Youkhna Amo, Shameran Barnabas, Chamoun Lazar, Lazar Odicho, Cherina Younan, Jamila Isaak, and Sharlet Younan*